Document Number Case Number
       03-C-0553-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
05/28/2004 03:33:48 PM CDT

**Confidential**

## Report of Jeffrey J. Cordray

## Ardisam, Inc. et al. v. Ameristep, Inc. et al.

### Introduction

My name is Jeff Cordray.  I am a Senior Economist at Christensen
Associates, an economic research and consulting firm.  My business address is
4610 University Avenue, Madison, Wisconsin.  Compensation for my work in this
case is $195 per hour.  I have a Masters degree in Economics from the
University of Alabama-Tuscaloosa, and a Bachelor of Science degree in
Economics from Bemidji State University.  I have been employed at Christensen
Associates since 1995.  A copy of my resume is attached as Appendix A.  A list
of the cases in which I have testified is presented as Appendix B.  Appendix C
lists the documents that I have received in this case.

I have been retained by the attorneys for the defendants in this case,
Ameristep, Inc. (Ameristep), Hunter's View, Ltd. (Hunter's View), and Eastman
Outdoors (Eastman) to measure the alleged damage incurred by the plaintiffs,
Ardisam, Inc. (Ardisam) and Spring Form, Inc. (Spring Form), and to evaluate the
report of Frances M. McCloskey dated April 30, 2004.  In analyzing the plaintiffs'
alleged damages (and Ms. McCloskey's report), I have assumed as true the
allegations set forth in the Amended Complaint dated November 20, 2003.  I
understand that the defendants dispute the allegations contained in the Amended
Complaint and I am not offering any opinions regarding liability in this case.  My

**Confidential**

opinions are based on the information available to me at this time.  However, discovery has not yet closed in the case at hand.  As additional information becomes available, I reserve the right to consider its effects on my opinions.


**Background**

Spring Form was granted U.S. Patent No. 5,038,812 ('812 patent) entitled "Quickly Erectable, Quickly Collapsible, Self Supporting Portable Structure" on August 13, 1991.  Spring Form and Ardisam allege that the defendants started infringing the '812 patent in 2000, with the first accused sale by Ameristep, followed shortly thereafter by Hunter's View and Eastman.[1]

Ardisam would not be a plaintiff to this suit without the exclusive agreement they entered into with Spring Form to use the '812 patented technology on May 8, 2003.[2]  Beyond exclusive use of the technology, Ardisam was also apparently allowed to sublicense to third parties, subject to Spring Form's approval, as well as engage in litigation.[3]

I have not been provided a copy of the agreement between Ardisam and Spring Form.  However, if the date of May 8, 2003, is correct, Ardisam would not have been a party at the hypothetical negotiations to license the '812 technology, at the date of the first accused sale.  The negotiations would have been between each of the defendants and Spring Form.

---

[1] Report of Frances M. McCloskey, April 30, 2004, p. 14.  For Eastman there appears to be an inconsistency between the date of the first accused sale relative to the models that are actually accused.  It is my understanding that only four Eastman models are accused and that each of these models was not available until 2004.
[2] Report of Frances M. McCloskey, April 30, 2004, p. 1.
[3] Report of Frances M. McCloskey, April 30, 2004, pp. 1, 14.

**Confidential**

It is my understanding that the accused products are all self-erecting, and correspondingly relatively lightweight and quick to set up, hunting blinds. However, the '812 technology does not cover all self-erectable structures nor all self-erectable hunting blinds. The defendants sell non-accused self-erecting hunting blinds. For example, Ameristep's outhouse model, which was first available in 1998,[4] is not accused. This model is shaped slightly different, but it is a self-erecting blind with the same basic weight and portability characteristics as Ameristep's accused blinds.[5] Eastman also sells larger, non-accused hunting blinds, which were available in 2000, and are self-erectable.[6]

Customers purchasing hunting blinds consider many factors including price, size of the blind, scent elimination, number of windows, camouflage pattern, edge relief, shadow elimination, and the ability to adapt to different environments.[7] However, the main function of a hunting blind is to provide concealment, which is a driving demand factor.[8] Hunters could purchase non-accused products from the defendants, if the accused products were taken off the market.

Based on conversations with counsel, the accused technology relates to a specific type of self-erectable hunting blind. Beyond models that were already available for sale, other acceptable substitute hunting blinds could have been

---

[4] Based on conversations with Ryan Kubica of Ameristep.
[5] Based on conversations with Ryan Kubica of Ameristep and www.ameristep.com/blinds.
[6] This model is called Carbon Venture Blinds by Eastman and is currently sold with and without Eastman's Safari System.
[7] Based on conversations with Ryan Kubica of Ameristep, Jeff Pestrue of Eastman, and Doug Smith of Hunter's View.
[8] Based on conversations with Ryan Kubica of Ameristep, Jeff Pestrue of Eastman, and Doug Smith of Hunter's View.

**Confidential**

manufactured in 2000.  For example, the technology used in Eastman's non-accused Carbon Venture Blinds, which are self-erecting, lightweight hunting blinds, could have been used to make smaller blinds, comparable in size and weight to each of the accused models.[9]

The defendants make the vast majority of its hunting blind sales indirectly.[10]  Some sales might be made directly over the internet, but most sales are made through retailers.  Ameristep has the largest market share in hunting blinds.[11]

**Summary of Opinions**

It is my opinion that lost profits are not appropriate in this case.  If any of the defendants are found to have infringed Spring Form's '812 patent, it is my opinion that a reasonable royalty of less than 5 percent of net revenues found to be infringing, from the date the Court determines damages should start to toll, would fully compensate the plaintiffs.

**Lost Profits**

Lost profits are an appropriate form of damages if, but-for the alleged infringement, the plaintiff(s) would have made the sales and if the lost profits can be calculated to a reasonable degree of economic certainty.  The <u>Panduit</u> case

---

[9] Based on conversations with counsel.  Moreover, it is my understanding that Eastman's Carbon Rifleman blinds are non-accused, self-erecting blinds, which can hold up to three hunters.
[10] Based on conversations with Ryan Kubica of Ameristep, Jeff Pestrue of Eastman, and Doug Smith of Hunter's View.
[11] Based on conversations with Ryan Kubica of Ameristep, Jeff Pestrue of Eastman, and Doug Smith of Hunter's View.

**Confidential**

provides a four-prong test to determine the appropriateness of recovering lost profits as damages.[12]  The patent holder must demonstrate demand for the patented product, the absence of acceptable non-infringing substitutes, the marketing and manufacturing capacity to make the lost sales, and an accurate accounting of its lost profits.[13]  If any of these four conditions is not satisfied, the patent holder is not entitled to lost profits.

To meet the first two prongs of the Panduit test, consumers must demand the patented technology/features.  I have not seen any evidence that customers demanded the patented technology.

As discussed above non-infringing substitutes existed—customers could have purchased non-accused models from the defendants.  Moreover, even if customers did demand currently unavailable shapes/sizes of non-accused, self-erecting (and lightweight) hunting blinds, these blinds could have been manufactured in 2000.  As a result, lost profits are not appropriate.  In Grain Processing, the Court denied a claim for profits because the infringer was able to show that it would have offered an acceptable and available non-infringing alternative.[14]  The court stated

> [A] fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed.  Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether.  The competitor in the 'but for' marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner.

---

[12] Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152.
[13] Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156.
[14] Grain Processing v. American Maize-Prod., 185 F.3d 1341 (Fed. Cir. 1999).

**Confidential**

> Moreover, only by comparing the patented invention to its next-best available alternative(s)—regardless of whether the alternative(s) were actually produced and sold during the infringement—can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented him from taking full economic advantage of this right.[15]

The third prong of <u>Panduit</u> is the marketing and manufacturing capacity to make the lost sales. The plaintiffs have not demonstrated that they had the capacity to make any additional sales. Regarding manufacturing capacity, Ms. McCloskey simply stated that she was told that there are manufacturers in Asia that could produce hunting blinds.[16] I have seen no evidence to support Ms. McCloskey's reliance upon Mr. Engstrom's statement, nor is there any indication of whom the manufacturers might be or what amount of incremental sales each could take on. Regarding marketing capacity, I have also seen no evidence that the plaintiffs could have sold the additional hunting blinds to the defendants' customers. Ms. McCloskey does not address whether the plaintiffs have the relationships or the ability to establish them with the defendants' distributors and retailers.

The plaintiffs have also not fulfilled the forth requirement of <u>Panduit</u>, which is an accurate accounting of lost profits. A proper accounting of profits must subtract all costs that the plaintiff would have incurred to make the additional sales. As the plaintiffs do not even know where manufacturing of the hunting blinds would have occurred, they cannot know all of the cost that would have resulted from making the accused sales.[17]

---

[15] <u>Grain Processing v. American Maize-Prod.</u>, 185 F.3d 1341, 1350-1351 (Fed. Cir. 1999).
[16] Report of Frances M. McCloskey, April 30, 2004, p. 9.
[17] The specifics of Ms. McCloskey's incremental profit margin calculation are redacted from the version of the report that I have received.

**Confidential**

**Reasonable Royalty**

The patent statute entitles a patent holder to recover no less than a reasonable royalty.[18]  Two commonly accepted means of determining a reasonable royalty are the rule-of-thumb[19] approach and an analysis under Georgia-Pacific.[20]  The Georgia-Pacific method calls for analysis of a reasonable royalty in the context of a hypothetical negotiation just prior to first infringement. At the negotiation, the patent holder and infringer are willing participants who start from the presumption that the patent is valid and infringed.[21]  The factors listed below are then considered.  I employ the rule-of-thumb under Factor 12, which directs me to consider the customary allocation of profit to the patent holder.

As discussed above the hypothetical negotiation would have occurred in 2000 between Spring Form and the defendants.  Ms. McCloskey errs in using May 8, 2003 as the hypothetical negotiation date.  As a result, the context for Ms. McCloskey's Georgia-Pacific analysis is in error.[22]  Ms. McCloskey also

---

[18] 35 U.S.C. §284.
[19] See Medical Instrumentation and Diagnostic Corporation v. Elekta AB, et al., No. 97-cv-02271 (S.D. Cal. Sept. 4, 2002), p.12; Syntex v. Paragon Optical, 7 U.S.P.Q.2d 1001, 1027 (D.Ariz. 1987); W.L. Gore & Associates v. International Medical Prosthetics, 16 U.S.P.Q.2d 1241, 1257 (D.Ariz. 1990); Polaroid v. Kodak, 16 U.S.P.Q.2d 1481, 1534 (D.Mass. 1990), correction for clerical errors, 17 U.S.P.Q.2d 1711 (D.Mass. 1991); Fonar v. General Electric, 902 F.Supp. 330, 353 (E.D.N.Y. 1995), aff'd in relevant part, 107 F.3d 1543, 1553 (Fed. Cir. 1997).
[20] Georgia-Pacific Corp. v. U.S. Plywood – Champion Papers Inc., 318 F. Supp. 1116 166 U.S.P.Q. (BNA) 235 (S.D.N.Y. 1970), modified, 446 F. 2d 295, 170 U.S.P.Q. 369 (2d Cir.), cert. denied, 404 U.S. 870 (1971).
[21] The description of the hypothetical negotiation is listed as Factor 15 in Georgia-Pacific.
[22] Unisplay, S.A. v. American Electronic Sign Co., Inc., 69 F.3d 512 (1995).  See also Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1158, which states, "The key element in setting a reasonable royalty after determination of validity and infringement is the necessity for return to the date when the infringement began."

**Confidential**

mistakenly includes Ardisam directly in the negotiations.  As Ms. McCloskey states, "Typically, the starting point in the hypothetical negotiation analysis is the determination of the date on which this negotiation would have taken place.  This is generally assumed to occur on the eve preceding the first date of alleged infringement, even when there are limitations on the periods for which damages may be recovered."[23]  The patent holder, Spring Form, is a named plaintiff to this suit.  As the Ardisam agreement did not occur until 2003, the negotiations would have been between Spring Form and the defendants.

**Factor 1: The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.**

I have not been provided any licensing information from the plaintiffs, aside from the information in Ms. McCloskey's report.  The license between Spring Form and Ardisam falls under Factor 1.  Ms. McCloskey misclassifies this license under Factor 2, even though she explicitly states that Spring Form, the patentee, licensed the patent in suit to Ardisam.[24]  More importantly, Ms. McCloskey misinterprets the meaning of the license.

Spring Form's '812 license to Ardisam was apparently for 7 percent of future sales.[25]  However, this was an exclusive license, which also apparently provided Ardisam the possibility of obtaining money through litigation.[26]  Spring

---

[23] Report of Frances M. McCloskey, April 30, 2004, p. 14.
[24] Report of Frances M. McCloskey, April 30, 2004, p. 1.
[25] I do not have the information available to determine what rate was paid on past accused sales.
[26] Report of Frances M. McCloskey, April 30, 2004, pp. 14, 18.  This license is approximately 3 years after the hypothetical negotiation.

**Confidential**

Form's licenses with the defendants would have been non-exclusive licenses, which would have called for a lower royalty rate as Ms. McCloskey recognized later in her paper.  "The license with defendants would be non-exclusive… A nonexclusive, unrestrictive license would generally command a lower royalty rate than an exclusive license."[27]  As a result, 7 percent is a clear upper bound, versus the lower bound concluded by Ms. McCloskey.  The ability of Ardisam to file suits against its competitors might have further inflated the rate from what would have been reached in the hypothetical negotiation—without this clause Ardisam and Spring Form would likely have agreed to a lower rate (beyond the exclusivity premium).  Shortly after the date of the Spring Form/Ardisam agreement this suit was filed.

Spring Form also licensed the '812 technology to Eastman on June 5, 2001, which is closer to the date of the hypothetical negotiation, at a royalty rate of 5 percent.[28]  This license was also an exclusive license and included a Canadian patent, which would both command a premium.  Spring Form would be willing to accept a lower royalty rate from Eastman if it could also receive royalties from Ameristep, Hunter's View, or Ardisam.  Five percent is an upper bound for a reasonable royalty for the '812 patent.

**Factor 2: The rates paid by the licensee for the use of other patents comparable to the patent in suit.**

---

[27] Report of Frances M. McCloskey, April 30, 2004, p. 19.
[28] Spring Form, Inc. Exclusive License Agreement.

**Confidential**

At this point, I have received one other license (not covered under Factor 1) involving the parties in suit.  This license is between Pure Concepts, Inc. and Eastman, and appears to have been negotiated with the license between Spring Form and Eastman discussed under factor 1.[29]  The license is an exclusive license which includes a U.S. and a Canadian patent.[30]  The royalty rate is 5 percent.[31]  I reserve the right to consider additional licensing information, should any become available.[32]

**Factor 3: The nature and scope of the license, as exclusive or nonexclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

I agree with Ms. McCloskey that the licenses with the defendants would be non-exclusive, which would command a lower royalty rate than an exclusive license.  However, I do not agree with her conclusion that the licenses should also allow the defendants to manufacture and sell hunting blinds in Canada.  The '812 patent does not cover products made, used and sold in Canada and the defendants should not be required to pay damages on such sales—the '812 patent is not enforceable in Canada.  Although it doesn't fall under this factor, Ms. McCloskey again misinterprets the 7 percent license between Ardisam and Spring Form under Factor 3.  As discussed above, the licenses with the

---

[29] Letter to Charles F. Gayton, III, dated June 11, 2001.
[30] Pure Concepts, Inc. Exclusive License Agreement.
[31] Pure Concepts, Inc. Exclusive License Agreement.
[32] I am also aware that Hunter's View has licensed in technology from Patent Category Corporation at 5 percent and has licensed out technology to Skyline Excel at 20 cents/yard.

**Confidential**

defendants would have been for a lower rate.  Moreover, a license to

manufacture and sell in the U.S. might draw a lower rate than a license covering

a larger geographic territory—namely the U.S. and Canada.

**Factor 4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

I have not been provided any information regarding Spring Form's

licensing policy.  However, I do know that Spring Form has licensed both

Eastman and Ardisam as discussed above.  Ms. McCloskey has analyzed the

wrong party under this factor, and has come to the wrong conclusion.  Ms.

McCloskey evaluated only Ardisam, as opposed to the more relevant party,

Spring Form.  The negotiations, at the date of the first accused sale, would have

been between Spring Form and the defendants.[33]  As Spring Form has

demonstrated its willingness to license its patented technology, this factor does

not call for an upward impact on the royalty rate.

**Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.**

---

[33] Even if the date of the hypothetical negotiation were in 2004, Spring Form's licensing policy should still be considered.  For example Spring Form could renegotiate with Ardisam.

**Confidential**

Ms. McCloskey has again focused on the wrong party under this factor and hence her conclusion calling for a higher royalty rate is not informative. Spring Form has never been a competitor of the defendants.[34]  Spring Form also does not appear to be a manufacturing company.  This factor does not call for an upward impact on the royalty rate.

**Factor 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

I have not seen any evidence that sales of the accused hunting blinds generated additional convoyed sales.  Ms. McCloskey argues that this factor calls for a higher royalty rate because retailers desire suppliers with a broad array of SKUs.[35]  However, as discussed above, since the defendants could have manufactured other non-accused hunting blinds—no reduction in SKUs would have been required.

**Factor 7: The duration of the patent and the term of the license.**

The filing date for '812 patent was August 18, 1989.  At the point of the hypothetical negotiation, the patent would have had approximately 9 years remaining.

---

[34] Based on conversations with Ryan Kubica of Ameristep, Jeff Pestrue of Eastman, and Doug Smith of Hunter's View.
[35] Report of Frances M. McCloskey, April 30, 2004, p. 21.

**Confidential**

**Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity.**

I am unaware of Spring Form having any success using the patented technology prior to the hypothetical negotiation, or of the relative levels of accused to non-accused sales of the other parties of this suit.  I will continue to evaluate this factor if additional information becomes available.

**Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.**

The defendants sell non-accused, self-erecting hunting blinds (as well as other non-accused blinds).  The technology used in these blinds could have been incorporated into the accused blinds.

**Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

As discussed above, consumers are likely to consider many factors when purchasing hunting blinds.  Ms. McCloskey claims that the patented technology results in a product that is "more lightweight, more easily transported, roomier, and provides greater protection from the elements."[36]  However, it is my

---

[36] Report of Frances M. McCloskey, April 30, 2004, p. 22.

**Confidential**

understanding that any differences in these characteristics brought about by the '812 technology, compared to the alternatives that would have been available, would have been transparent to customers.  For example, I understand that the blind's roof shape is the difference between Ameristep's non-accused outhouse models and the accused models.  The outhouse has a teepee shape and the accused products have more of a dome shape.[37]


**Factor 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

The fact that the defendants still sell non-accused self-erecting (lightweight and easily transported) hunting blinds suggests that they receive little value from the accused technology.  I am currently unaware of changes in past sales levels; however, discovery is ongoing.


**Factor 12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

A "rule of thumb" that a royalty rate should be between one-quarter and one-third of the infringer's expected operating profit margin is widely accepted.[38]

---

[37] Based on conversations with Ryan Kubica of Ameristep.  See also www.ameristep.com/blinds.
[38] See Medical Instrumentation and Diagnostic Corporation v. Elekta AB, et al., No. 97-cv-02271 (S.D. Cal. Sept. 4, 2002), p.12; Syntex v. Paragon Optical, 7 U.S.P.Q.2d 1001, 1027 (D.Ariz. 1987); W.L. Gore & Associates v. International Medical Prosthetics, 16 U.S.P.Q.2d 1241, 1257 (D.Ariz. 1990); Polaroid v. Kodak, 16 U.S.P.Q.2d 1481, 1534 (D.Mass. 1990), correction for clerical errors, 17 U.S.P.Q.2d 1711 (D.Mass. 1991); Fonar v. General Electric, 902 F.Supp. 330, 353 (E.D.N.Y. 1995), aff'd in relevant part, 107 F.3d 1543, 1553 (Fed. Cir. 1997).

**Confidential**

In the absence of expected profit information on the accused products, actual profitability prior to and after the negotiation can be used to infer expectations.

At the current time, I only have profitability information for Hunter's View. The overall operating profit for Hunter's View was approximately 9 percent in 2000 through 2002, and was approximately 7 percent in 2003.[39]  These rates also approximate the profits made on the accused blinds.[40]  In license settlement correspondence, Mike Stone of Eastman also stated that margins were thin.[41] Discovery is ongoing and I will update my analysis if more information becomes available.  However, using a 9 percent margin, according to the rule of thumb the royalty rate should fall between 2.25 and 3.00 percent.

Ms. McCloskey discusses the rule of thumb separately from Factor 12, which is merely an organizational difference.  However, Ms. McCloskey's calculations are not informative under a rule of thumb analysis as she has used the wrong baseline.  The parameters are expected <u>operating</u> profit of the infringer.  Ms. McCloskey has offered the actual <u>incremental</u> profit of a plaintiff. Ardisam's incremental profit rate is not instructive in a rule of thumb analysis.


**Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing**

---

[39] Based on conversations with Doug Smith of Hunter's View.
[40] Based on conversations with Doug Smith of Hunter's View.
[41] "I can not speak for management; but the extra 5 points will make selling blinds very unattractive; as the margins are so tight to start with."  Email from Mike Stone to Gerald Helget dated July 30, 2003.

**Confidential**

**process, business risks, or significant features or improvements added by the infringer.**

As discussed above, when purchasing a hunting blind, many non-accused factors are likely to impact customers' purchasing decisions, such as camouflage pattern and scent elimination.  Moreover, other acceptable substitute hunting blinds could have been, and were, manufactured and sold.

**Factor 14: The opinion testimony of qualified experts.**

Based on the information currently available to me, it is my opinion that the hypothetical negotiations with the defendants would have resulted in a royalty rate of less than 5 percent.

SIGNED ON THIS 28th DAY OF MAY, 2004

_____
Jeffrey J. Cordray

# Appendix A

# Jeff Cordray

RESUME

April 2004

**Address**:

Laurits R. Christensen Associates, Inc.
4610 University Avenue, Suite 700
Madison, WI  53705-2164
Telephone:  608.231.2266
Fax:  608.231.2108
Email:  jeff@LRCA.com

**Academic Background**:

M.A., University of Alabama-Tuscaloosa, 1995, Economics
Accepted into PhD Program
B.S., Bemidji State University-Minnesota, 1993, Economics
Graduated Cum Laude, Awarded Outstanding Research in Economics

**Positions Held:**

Senior Economist, Laurits R. Christensen Associates, Inc., 1999-present
Economist, Laurits R. Christensen Associates, Inc., 1998
Staff Economist, Laurits R. Christensen Associates, Inc., 1995-1997
Consultant/Intern, ReliaStar, Minneapolis, MN, 1995

**Professional Experience:**

Provide support in a number of litigation contexts including antitrust, patent infringement, breach of contract, trademark infringement, discrimination, personal injury, and wrongful death cases.  Duties include development of damage analysis, management of staff, regression and other statistical analysis, deposition and trial support, and preparation of exhibits.

**Appendix B**
**Deposition and Trial Testimony of Jeffrey J. Cordray for the Preceding Four Years**

| Date | Case Name | Client | Firm | Court |
|------|-----------|--------|------|-------|
| 2003 | In re: J.P. Hering Distributing Company, Inc. et al. | Quality Beverages of Wisconsin | Collins, Quillin & Knothe | U.S. Bankruptcy Court, Western District of Wisconsin |
| 2003 | Michael E. Papara et al. v. Jeffrey S. Kolar et al. | Michael E. Papara et al. | Pappas Law Office | Wisconsin Circuit Court, Racine County |

**Appendix C**
**Documents Received by Jeffrey J. Cordray**

AFFIDAVIT OF GERALD HELGET IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND EXHIBITS
AMENDED COMPLAINT
CORRESPONDENCE M MACFARLANE, S SIEGEL AND J MCCONAGHY
EASTMAN OUTDOORS' ANSWER TO AMENDED COMPLAINT
EASTMAN OUTDOORS PURCHASE ACTIVITY REPORT - PURE CONCEPTS
FAX TO B EASTMAN FROM C GAYTON 6/21/01 W/LICENSE AGREEMENT
FAX TO BOB EASTMAN FROM CHUCK GAYTON 6/12/01
FAX TO LENNY REZMER FROM CHUCK GAYTON 4/2/02
FAX TO LORI MARCO FROM MIKE STONE 11/25/03
GAME TRACKER BLIND SALES BY MODEL NUMBER AND YEAR
GT/EO MONTHLY ROYALTY REPORTS
LETTER TO BOB EASTMAN FROM CHUCK GAYTON 3/22/02
LETTER TO BOB EASTMAN FROM CHUCK GAYTON 6/5/01
LETTER TO BOB EASTMAN FROM JOHN D MCCONAGHY 3/18/03
LETTER TO BRUCE CHAPMAN FROM BOB EASTMAN 5/3/01
LETTER TO C GAYTON FROM L REZMER 3/26/02 W/SALES REPORT
LETTER TO C GAYTON FROM S SIEGEL 6/11/01 W/LICENSE AGREEMENTS
LETTER TO CHARLES GAYTON FROM WILLIAM D BLACKMAN 3/22/02
LETTER TO CHARLES GAYTON, III FROM SHELDON SIEGEL 4/4/02
LETTER TO CHUCK GAYTON FROM BOB EASTMAN 5/29/01
LETTER TO MICHAEL STONE FROM LORI J MARCO 11/10/03
LETTER TO MIKE STONE FROM JOHN D MCCONAGHY 4/4/03
LETTER TO R EASTMAN, L REZMER, S SIEGEL FROM W BLACKMAN
LETTER TO S SIEGEL FROM M G MACFARLANE W/PATENT 3,990,463
LICENSE AGREEMENT BETWEEN PURE CONCEPTS AND EASTMAN
LICENSE AGREEMENT BETWEEN SPRING FORM AND EASTMAN
LICENSE SETTLEMENT OFFER EMAILS
MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT AGAINST EASTMAN
NOTICE OF MOTION AND MOTION SUMMARY JUDGMENT AGAINST EASTMAN
PRELIMINARY EXPERT REPORT OF FRANCES M MCCLOSKEY 4/30/04
PROPOSED FINDINGS OF FACT RE SUMM JUDGMENT AGAINST EASTMAN
PURE CONCEPTS ON APEX BLINDS EMAIL 4/5/02
THREE YEAR SALES COMPARISON INVOICED SORTED BY PART